Argued and submitted April 18, affirmed June 6, reconsideration denied by opinion
September 26, 1990
See 103 Or App 482, 798 P2d 260 (1990)

# MARCOULIER,
*Appellant,*

*v.*

# UMSTED,
*Respondent.*

# UMSTED,
*Third-Party Plaintiff - Respondent,*

*v.*

# MARCOULIER et al,
*Third-Party Defendants - Appellants,*

*and*

# STEEN,
*Third-Party Defendant.*

(37726; CA A48775)

793 P2d 881

David Gernant, Portland, argued the cause and filed the briefs for appellants.

Gregory P. Lynch, Bend, argued the cause for respondent. With him on the brief was Gray, Fancher, Holmes, Hurley, Bryant & Lovlien, Bend.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Don Marcoulier brought this action against Umsted, arising out of their business relationship as principals in the Mid-State Meat Company (Mid-State). Umsted filed a third-party claim against Marcoulier and his father, Felix, alleging that they conspired and interfered with his business relationship with Steen, the contract seller of Umsted's one-half interest in Mid-State. The trial court treated Don's claim as a partnership dissolution proceeding and separated it from the third-party claim for trial. Umsted received a net judgment in the dissolution proceeding. The third-party claim was then tried to a jury, and Umsted was awarded punitive damages and compensatory damages for lost future profits. Don and Felix appeal,[1] contending that the court erred in connection with both proceedings. We affirm.

Felix founded Mid-State in the 1940's and operated it on property that he owns. In the early 1970's, he conveyed a one-half interest in the business, but not the real property, to Don. They conducted Mid-State as partners until 1975, when Felix conveyed his one-half interest to Steen. Felix retained the real property and began charging Mid-State rent of $300 a month. In 1982, Steen and Umsted entered into a contract for Umsted's purchase of Steen's one-half interest in Mid-State. The $27,000 unpaid balance of the purchase price was to be paid in annual installments of $3,000.

Before the contract between Umsted and Steen was executed, Felix agreed orally to lease the building to Mid-State for $600 a month for five years. Shortly after Umsted became a principal in the business, Don proposed that Umsted purchase his share of Mid-State. Umsted's refusal triggered a pattern of activity by Felix and Don to force Umsted out of the business. The pattern included accusations by Don that Umsted was diverting money from the business; refusals by Don to slaughter animals; Don's registration of the Mid-State name and his opening of a business checking account in his name only; his refusals to pay Umsted any share of the profits; threats by Felix to terminate the Mid-State tenancy if Umsted did not sell Don his interest in the business for $1,500; and a

---

[1] We will refer to Don and Felix by their first names when differentiation is needed and as "appellants" when they can be discussed collectively.

pronouncement by Felix that the rent would be raised to $1,500 a month. There was evidence that Don's and Felix's actions were concerted, were undertaken for the purpose of ejecting Umsted from the business and were done with the knowledge that Umsted needed the profits from the business to pay the balance on his contract with Steen. Umsted failed to make payments and, eventually, Steen sold Don his interest in the contract, for an amount far below the unpaid balance. Don then filed a foreclosure action against Umsted.

■   Appellants assign four errors, the first three of which are directed at the third-party action. They contend, first, that the trial court erred by denying various rulings that they sought on the ground that the partnership dissolution proceeding was *res judicata* and barred the third-party claim. They explain in their brief that, although " '*res judicata*' may not have been the right label," it was made clear to the trial court that what they were really arguing was that the dissolution proceeding provided full relief and was Umsted's exclusive remedy. However, the portion of the record set out in appellants' assignment does not indicate that anyone was talking about any theory other than *res judicata.* As quoted by appellants, it reads:

> "[Don's attorney]:   Your Honor, I'm not going to be lengthy on this because we've discussed it quite a bit, but we think the plaintiff is barred on the doctrine of res judicata for the reasons already argued extensively to the court.
>
> "* * * * *
>
> "[Felix's attorney]:   I'll join in that one also on behalf of my client.
>
> "The Court:   For purposes of the record, in res judicata, we are talking in terms of the dissolution of the partnership and the decree that was rendered by Judge Edmonds under the same case number. Do the parties agree that that's what we are talking about?
>
> "[Felix's attorney]:   Yes, Your Honor.
>
> "[Umsted's attorney]:   Yes, Your Honor.
>
> "* * * * *
>
> "[Don's attorney]:   Yes, Your Honor.
>
> "The Court:   In the same case number on the decree—
>
> "[Don's attorney]:   Yes.

"The Court: —on the decree of dissolution of the part-
nership?

"[Don's attorney]: True.

"The Court: Next motion [*i.e.,* motion based on 'res judi-
cata' was thus denied]."

The partnership dissolution and the third-party claim were
part of one action. The defense of *res judicata* is therefore not
available. *Office Services Corp. v. CAS Systems, Inc.,* 63 Or
App 842, 666 P2d 297, *rev den* 295 Or 773 (1983).

■      Appellants next argue that the court erred by not
allowing them to introduce evidence and to obtain a jury
instruction concerning Umsted's duty to mitigate damages.
The court based its rulings on appellants' failure to plead
mitigation as an affirmative defense. Umsted responds, *inter
alia,* that appellants made no offer of proof to show the evi-
dence of non-mitigation that they would put on. Appellants
contend that no offer was needed, because, in their words:

> "OEC 103 requires an offer of proof only in the circum-
> stance where an evidentiary objection has been upheld to a
> question asked. By contrast, where the court has made a rul-
> ing of law that evidence of a certain type may not come into
> court, or that witnesses of a certain age may not testify, an
> offer of proof is unnecessary and would be an empty gesture.
> *Kreutzer v. Kreutzer,* 226 Or 158, 359 P.2d 536 (1961); *State
> v. McLean,* 1 Or App 147, 459 P.2d 559 (1969)[, *aff'd* 255 Or
> 464, 468 P2d 521 (1970)]."

OEC 103(1)(b) provides:

> "(1)    Evidential error is not presumed to be prejudicial.
> Error may not be predicated upon a ruling which admits or
> excludes evidence unless a substantial right of the party is
> affected, and:
>
> "* * * * *
>
> "(b)    In case the ruling is one excluding evidence, the
> substance of the evidence was made known to the court by
> offer or was apparent from the context within which questions
> were asked."

The portions of the record that appellants quote show nothing
apparent about the *substance* of the evidence that appellants
would or could produce, except that it pertained to the broad

subject of mitigation. Appellants misread OEC 103 as requiring an offer of proof only when a question has been asked. The words "apparent from the context within which questions were asked" mean that: *if* questions have been asked, an offer of proof is sometimes *unnecessary.* We find nothing in the cases that is even arguably apposite to the issue in this case, and we reject the assignment for lack of preservation.

■      Appellants' third assignment is a sprawling maze of contentions that challenge unrelated rulings involving marginally related issues.[2] The thrust of their principal (or longest) argument in support of the assignment is that Felix's oral promise of a five-year lease at a $600 monthly rental was not proved and cannot be proved under the Statute of Frauds, that Felix was therefore free to raise the rent on 30 days notice and, therefore, he had no duty of non-interference, and so his action was privileged.

This, of course, is not a contract action. The significance of Felix's lease negotiations with Steen and his subsequent escalation of the rent is that they were part of a pattern of conduct aimed at excluding Umsted from the business and destroying his contractual relationship with Steen. There was ample evidence that appellants acted in "pursuit of an improper objective" and used "wrongful means." *Straube v. Larson,* 287 Or 357, 360, 600 P2d 371 (1979). However, appellants rely on the principle that, if a person who interferes with contractual relations "is promoting an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified." *Wampler v. Palmerton,* 250 Or 65, 74, 439 P2d 601 (1968). Appellants then conclude that the "right of a property owner incident to his ownership is considered absolute. It is thus 'superior in social value' to any interest Umsted may have had in the partnership."

---

[2] The assignment states:

"The court erred in denying Felix and Don's motions for directed verdict on the ground of a lack of evidence to support the legal theory of 'interference' with Umsted's business interests, by either Felix or Don; and in denying defendants' requested instructions that a party to a contract cannot sue in tort for interference with a business relation, that Felix had an absolute right to do what he did in raising the rent, that a month-to-month tenancy may be terminated or changed on 30 days' notice, and on the Statute of Frauds." (Citations to record omitted.)

Without commenting on any other possible problems with appellants' argument, it posits the wrong comparison. The gravamen of the allegation is not that Felix transcended the rightful use of his property by charging exorbitant rent, but that he threatened the massive increase in rent as part of a concerted campaign to expel Umsted from the business and destroy his contractual relationship with Steen. As in *Straube v. Larson, supra,* it was at least a question for the jury whether Felix's actions were taken to promote his legitimate interests or "to satisfy private grudges." 287 Or at 370. We reject the argument that Felix's actions were absolutely privileged as a matter of law.

Appellants contend next that none of Don's actions can give rise to the tort, because a person cannot be liable for interference with a contract to which he is a party. Umsted replies that his

> "right to receive future profits was based upon his ownership of an undivided one-half interest in the Mid-State Meat Company. Umsted derived that ownership interest by virtue of a contract in which he was involved with a third party, Steen. In that the Marcoulier interference was with the Steen contract, Don Marcoulier's interference was likewise not privileged."

That is correct. *See also Lewis v. Oregon Beauty Supply Co.,* 302 Or 616, 733 P2d 430 (1987).

Appellants' final contention in support of their third assignment is that there was no evidence that Felix was involved in any of Don's wrongful acts. We disagree. The evidence of a conspiracy abounded.[3]

Appellants' last assignment is directed at the partnership dissolution proceeding, and it warrants no discussion.

Affirmed.

---

[3] Because of our conclusion, we do not reach a number of appellants' other arguments, *e.g.,* that punitive damages cannot be sustained if the award of special damages is set aside and that Felix's contacts with Umsted amounted to exercises of free speech.